UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MARSHALL B. CURTIS,

                      Plaintiff,

      vs.                             Civil Action No.
                                      5:04-CV-527 (NPM/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.

_____

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

MARSHALL B. CURTIS, *pro se*


FOR DEFENDANT:

HON. GLENN T. SUDDABY        WILLIAM H. PEASE, ESQ.
United States Attorney          Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York  13261-7198

OFFICE OF GENERAL COUNSEL    BARBARA L. SPIVAK, ESQ.
Social Security Administration    Chief Counsel, Region II
26 Federal Plaza
New York, NY 10278           GINA SHIN, ESQ.
                               Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Marshall B. Curtis, who suffers from several mental and physical conditions including, principally, hypochondroplasia and nephrotic syndrome, as well as an alcohol abuse condition of long standing, has commenced this proceeding to challenge the denial of his application for childhood disability and supplemental security income ("SSI") Social Security benefits.[1]  That denial was based upon the conclusion of the Administrative Law Judge ("ALJ") who decided the matter at the agency level that notwithstanding his other limitations, absent plaintiff's alcohol abuse he would be capable of performing a full range of medium work. Application of that finding and plaintiff's other relevant characteristics to the medical-vocational guidelines (the "grid") set forth in the governing regulations, 20 C.F.R. Pt. 404, Subpt. P. App. 2, resulted in the conclusion that there are jobs in sufficient numbers in the national economy which the plaintiff would be capable of performing under those circumstances.

---

[1]  According to one authoritative source, hypochondroplasia is a form of dwarfism characterized by short stature and disproportionately short limbs with broad, short fingers.  Dorland's Illustrated Medical Dictionary 861 (29th ed. 2000); *see also id.* 15, 343, 609.  That same source defines nephrotic syndrome as any disease of the kidneys that includes purely degenerative lesions of the renal tubules, characterized by low levels of albumin in the blood, high blood levels of cholesterol, and swelling caused by the accumulation of abnormally large amounts of fluid in the body.  *Id.* 1188; *see also id.* 567-68, 849, 860.

Having reviewed the record, without the benefit of a brief illuminating the arguments in support of plaintiff's judicial challenge to the Commissioner's determination, I find that the determination of no disability resulted from the application of proper legal principles and is supported by substantial evidence.

I.    BACKGROUND

Plaintiff was born on January 3, 1966; at the time of the administrative hearing in this matter, he was thirty-seven years old. Administrative Transcript (Dkt. No. 11) at pp. 41, 258, 264.[2]  Plaintiff attended school only through the ninth grade, but later received a general equivalency diploma ("GED") in 1985, while in prison.[3]  AT 264-65.  Aside from casual employment during 2001 working at a neighbor's lumber yard on an occasional basis in return for payment of $50 per day, *see* AT 282-84, plaintiff did not work during the relevant times, having last been employed for approximately one month in 1994 in a position which he voluntarily left based upon his inability to secure transportation to and from

---

[2]    Portions of the Administrative Transcript of evidence and proceedings before the agency, Dkt. No. 11, filed by the Commissioner together with her answer, will be cited as "AT _____".

[3]    In his disability report, plaintiff indicates that his GED was received in 1982. *See* AT 67.

work.[4]  AT 61, 267.   Plaintiff also reports having worked intermittently as a

janitor, AT 62; as a tavern worker, AT 74, 76; and in various other

temporary positions, AT 77.

The medical evidence in the record reveals that over the course of

time, plaintiff has suffered from several documented medical conditions.

Plaintiff was diagnosed in 1968, during his early childhood, as suffering

from nephrotic syndrome.  AT 108-11.  The record does not disclose,

however, that plaintiff has undergone any significant, ongoing treatment

for the condition, nor does it suggest any significant limitations associated

with it.  Plaintiff also suffers from hypochondroplasia, a form of dwarfism.

*See* AT 61; *see also ante* n.1.

Plaintiff's medical records reveal that he has sought treatment over

the years from various sources for his physical conditions, primarily

through emergency room visits.  With the exception of treatment in

February of 1994 at the Community General Hospital for a blowout

fracture involving the inferior and possibly anterior walls of his right orbit,

with no apparent residual effects, *see* AT 160-63, the vast majority of

plaintiff's emergency room treatment appears to have stemmed from his

---

[4]   Plaintiff's work history report reflects his having worked between November of
2000 and February, 2001 delivering and stacking firewood.  AT 74-75.

abuse of alcohol.  In April of 2001, for example, Curtis presented to the St.

Joseph Hospital Health/Center emergency room where he was examined

by Dr. William Zehner, and diagnosed with hepatitis further described as

"probably alcohol related".  AT 178-80.  On that occasion plaintiff was

treated with antibiotics and directed to make an appointment with an

outpatient family practice, operated as an adjunct to the hospital.  *Id.*

     As a result of that referral, plaintiff was seen on May 4, 2001 at the

family practice clinic by Laura Arndt, R.P.A.C., who interviewed and

examined him on that date.  AT 176-77.  While plaintiff complained of

various conditions including weakness, numbness, tingling, and aches

and pains in various areas, and acknowledged his alcohol abuse

condition, the results of the examination rendered on that date were

largely unremarkable.  *Id.*  Ms. Arndt diagnosed plaintiff as suffering from

peripheral neuropathy, congenital bone disease-possible dwarfism,

alcohol abuse, and probable anxiety and depression, and recommended

that he undergo additional testing.  *Id.*  Ms. Arndt noted that plaintiff was

agreeable to that course of action, and would follow-up with Dr. Howell at

the clinic "in a couple of weeks."  *Id.*  Despite this recommendation, there

is no record of any follow-up by the plaintiff with the family health practice

clinic.

In September of 2001 plaintiff again sought emergency room treatment, this time at Crouse Hospital, requesting detoxification.  AT 172-75.  During that visit plaintiff reported that he drinks between twelve and twenty-four beers each day, and offered his belief that he may suffer from an enlarged liver.  AT 172.  In response to questioning concerning his history, plaintiff denied any psychiatric history but acknowledged his past diagnosis of nephrotic syndrome and alcoholic hepatitis.  *Id.*  Plaintiff was diagnosed by Dr. Fouad Boulos, the physician who examined him, as suffering from alcohol abuse, and was admitted to the hospital on September 26, 2001, where he was treated with Valium and provided with detoxification counseling.  AT 172-75.  Plaintiff left the hospital two days later, against medical advice.  AT 190.

On October 10, 2001, plaintiff again presented to the Crouse Hospital emergency room, complaining on this occasion of an accidental overdose of No-Doze and alcohol.[5]  AT 171-71A.  Plaintiff was

---

[5]   In recounting his symptomology, plaintiff stated that he was attempting to "get high and get a 'buzz'" and during the process had ingested approximately twelve No-Doze tablets and consumed alcohol.  AT 171.  There is no indication that the event, which was described in the emergency room report as "an accidental overdose", represented an attempt by the plaintiff to commit suicide or otherwise harm himself. *Id.*

administered Valium and, after a period of observation, was discharged but advised to follow up with outpatient detoxification.  AT 171-71A.

As a precursor to evaluation for treatment to be administered by Central New York Services ("CNYS"), plaintiff was admitted to Crouse Hospital on March 7, 2002, where he remained for two days.  AT 236, 239-40.  During that visit, plaintiff acknowledged to hospital workers drinking at least a twelve pack of beer each day, and occasionally using marijuana.  AT 239.  Plaintiff also noted a history of depression, but stated that he was not currently taking any medication for that condition.  *Id.* Plaintiff was diagnosed as suffering from ethanol abuse, marijuana abuse, dwarfism, and a history of nephrosis, and was discharged on March 9, 2002 with a prognosis registered as "[g]uarded" but without prescription of any medications.  AT 236, 240.

Plaintiff appeared again at the emergency room on August 16, 2002, complaining of gastrointestinal bleeding.[6]  AT 237-38.  On that occasion, plaintiff again reported his history of alcohol and marijuana abuse, stating that "[h]e continues to drink between 1-3 six-packs per day."  *Id.*  The

---

[6]    Under the listing of chief complaint, the report of that admission initially states that plaintiff was requesting detoxification as well as treatment for gastrointestinal bleeding, but goes on to note that "[a]ctually, the patient doesn't want anything to do with the detox."  AT 237.

report further notes that plaintiff "has no interest in rehab, detox or any sort of treatment for his alcoholism." *Id.* Observing that the plaintiff appeared to be "somewhat tremulous" and to evidence "some element of alcohol withdrawal," the examining physician, Dr. Richard Steinmann, recommended that plaintiff remain in the hospital; Curtis refused, however, and was discharged in unstable condition, against medical advice, despite strong encouragement that he remain and obtain treatment which "he absolutely refuse[d]." AT 238.

At the suggestion of both personnel at Crouse Hospital and his Onondaga County Case manager, in March of 2002 plaintiff was referred into the Continuing Day Treatment Program operated by CNYS, for treatment of his condition. AT 216. Unfortunately, however, plaintiff appeared for his first intake appointment at CNYS under the influence of alcohol, and therefore was directed to undergo detoxification at Crouse Hospital as a condition of his admission into the program. *Id.* After fulfilling that requirement, *see* AT 236, 239-40, plaintiff returned to CNYS on March 20, 2002 where he underwent an intake assessment. AT 216-18. Based upon that evaluation plaintiff was diagnosed as suffering from alcohol, cannabis dependency and major depression, and was assigned a

global assessment of functioning ("GAF") score of sixty-five.[7]  AT 217.

Based upon their findings, professionals at CNYS recommended a multi-

faceted course of treatment.  AT 217.  After a third screening visit,

conducted on March 27, 2002, AT 218-19, at which plaintiff was

diagnosed as suffering from major depression, alcohol dependence and

cannabis abuse and assigned a GAF score of 50, plaintiff was admitted to

the Continuing Day Treatment Program on March 27, 2002.  Curtis was

later discharged from the program on May 10, 2002, however, as a result

of non-attendance.  AT 228; *see also* AT 269, 281.

Plaintiff has also sought and obtained treatment at various times

from the Westside Family Health Center, which is apparently also affiliated

with St. Joseph's Hospital/Health Center.  Plaintiff was examined by a

Westside physician, Dr. Ekaterina Milchtein, on January 18, 2002.  AT

164-67.  During that session, Curtis complained of rectal bleeding and

abdominal pain and acknowledged drinking between three and four beers

daily and smoking marijuana occasionally.  AT 166.  With the exception of

---

[7]     GAF is described as a "clinician's judgment of the individual's overall level of functioning."  Diagnostic and Statistical Mental Disorders 32 (4th ed., Text Revision 2000) ("DSM-IV-TR").  A person with a score of 65 experiences some mild symptoms, such as depressed mood, or some difficulty in social, occupational, or school functioning, but generally functions "pretty well" and has some meaningful interpersonal relationships.  *Id.* 34.

a ruptured eye blood vessel plaintiff's physical examination on that occasion was normal. *Id.* Following that examination additional urine and blood testing was ordered and conducted. AT 169-70.

On August 22, 2002, Dr. Luis Castro, who plaintiff sees on an as-needed basis primarily for the purpose of obtaining a prescription for Neurontin, AT 269-70, completed an assessment of plaintiff's mental and physical capacities. AT 249-57. In that report Dr. Castro rendered several diagnoses, including alcohol dependency, and rated both plaintiff's response to treatment and his prognosis as "poor". AT 249. Addressing his physical limitations, Dr. Castro opined that in an eight hour work day plaintiff can sit for a total of eight hours, and two without interruption; can stand for four hours, and one without interruption; and is capable of walking for a total of two hours, including one hour without interruption. AT 255. Dr. Castro also opined that plaintiff can frequently lift and carry up to twenty pounds, and occasionally as much as fifty. AT 254. Dr. Castro further noted various environmental limitations, including a restriction on activities involving moving machinery, temperature extremes, fumes, and vibrations. AT 257.

On the following day, August 23, 2002, plaintiff presented to Dr.

Castro complaining of various muscular and skeletal pain.  AT 241-42.
The results of Dr. Castro's examination on that date were largely
unremarkable.  *Id.*  As a result of his evaluation Dr. Castro diagnosed
plaintiff as suffering from congenital hypochondroplasia with
musculoskeletal pain, and recommended treatment with Flexeril and
Neurontin.[8]  AT 242.  On that date, apparently as a result of that visit, Dr.
Castro signed a physician's statement form requesting an assessment of
plaintiff's employability, noting that Curtis was permanently unable to work
as a result of his hypochondroplasia.  AT 247-48.

Plaintiff returned to Dr. Castro in October of 2002 for a follow-up
examination.  AT 243-44.  During that visit, plaintiff reported that he had
obtained relief through use of the Neurontin and had reduced his alcohol
intake to a point of "only occasionally drinking alcohol."  AT 244.  In that
examination, plaintiff reported experiencing occasional rectal bleeding,
and was referred back to Dr. Epstein for follow-up gastrointestinal
examination.  *Id.*

Plaintiff later saw Dr. Castro on November 5, 2002, reporting that he

_____

[8]   According to his office notes of that visit, Dr. Castro also pointed out that
plaintiff had two prior unexplained appointment absences and apprised him of the fact
that any additional unexplained absences would result in his disenrollment.  AT 242.

11

was feeling well and that his back pain had stabilized.  AT 246.  During that visit plaintiff registered no new complaints of symptomology.  *Id.*  Dr. Castro's office notes from that visit reflect abnormal liver function testing, attributable to "[p]robable alcoholic hepatitis."  *Id.*

In addition to seeking care from various treating sources, plaintiff was consultatively examined on January 4, 2002 by psychologist Dr. Jeanne A. Shapiro, and by physician Dr. Kalyani Ganesh.  AT 181-89. Based upon her examination, Dr. Shapiro estimated plaintiff's intellectual functioning to be in the borderline deficient range, but observed that plaintiff could follow and remember simple instructions.  AT 183-84.  Dr. Shapiro found that plaintiff's psychiatric problems would not significantly interfere with his ability to function on a daily basis, and rendered an Axis I diagnosis of alcohol abuse, recommending in connection with Axis II that anti-social personality disorder and mental retardation or borderline intelligence be ruled out as potential diagnoses.  AT 184.  Based upon her examination, Dr. Shapiro recommended that plaintiff undertake vocational assessment and training, and expressed the hope "that with some intervention and support, he will find symptom relief and maximize his abilities".  *Id.*

During Dr. Ganesh's examination, plaintiff reported his chief complaints as including bone pain, circulation problems, stomach pain, rectal bleeding, and a nervous condition.  AT 186.  Plaintiff denied any longer drinking heavily, but did admit to occasional use of illicit drugs.  *Id.* Based upon his findings, Dr. Ganesh concluded that plaintiff suffered from histories of alcoholic hepatitis, congenital nephrotic syndrome, and bone pain, but found no limitation presented by those conditions to plaintiff's ability to sit, stand, walk, climb, bend, or squat, with the use of any upper extremity.  AT 189.

During the hearing plaintiff was questioned regarding his daily activities.  In his testimony plaintiff admitted to ongoing consumption of alcohol, stating, in response to the ALJ's questioning concerning an odor of alcohol, that he had consumed four beers on the day before the hearing.  AT 268, 272.  Plaintiff states that with the exception of the treatment regimes noted above, he has not participated in any alcohol abuse or substance abuse programs.  AT 269.  Plaintiff does not have a driver's license, and for transportation is required to rely on public bus service, taxicabs, and rides from friends.  AT 265-66.  At the time of the hearing plaintiff's living situation was in flux; plaintiff reported having

recently moved out of a house shared with five other men and looking for a new residence.  AT 265.  Plaintiff testified that he regularly visits his mother, who is in a nursing home, and occasionally travels to see his brother and sister.  AT 271-72.  Plaintiff goes to the grocery store once monthly, and supplements those visits by shopping at a local corner store. AT 273.  Plaintiff socializes occasionally, including drinking with friends, but does not attend other social activities or religious services.  AT 87, 273.

II.   PROCEDURAL HISTORY

    A.   Proceedings Before The Agency

Plaintiff filed applications for childhood disability and SSI benefits under Titles II and XVI, respectively, of the Social Security Act on December 18, 2001, alleging a disability onset date of January 1, 1984.[9] AT 41-43, 258-59.  Those applications were denied on April 3, 2002.  AT 30-33.

At his request, a hearing was conducted before ALJ Daniel G. Healey on September 10, 2003 to address plaintiff's claim for benefits

---

[9]   Plaintiff's application for childhood disability insurance benefits under the Act is based upon the death of his father on December 18, 1985.  AT 41.  The Commissioner does not challenge plaintiff's entitlement to such benefits in the event of a finding of disability.

under the Act.  AT 261-86.  While plaintiff was not represented by counsel at the hearing, he was accompanied by Barbara Romeo, a law assistant with the Legal Services of Central New York, as well as his Onondaga County Case Manager, David Hinman, who attended the hearing as an observer only, but did not testify.  *Id.*

_____On November 17, 2003 ALJ Healey issued a decision upholding the denial of benefits to the plaintiff.  AT 11-18.  In that decision, the ALJ employed the now-familiar, five step test for determining disability.  After concluding, at step one, that the plaintiff had not engaged in substantial gainful employment during the relevant times, AT 12, the ALJ went on to find that plaintiff suffers from impairments, including substance abuse, alcoholic hepatitis and congenital nephrotic syndrome, which are sufficiently severe to significantly limit his physical or mental ability to perform basic work activities, but that those impairments, either individually or in combination, are not sufficiently severe to meet or equal any of the listed, presumptively disabling impairments set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 13.

The ALJ next turned to assessment of plaintiff's residual functional capacity ("RFC").  AT 13.  After reviewing the evidence in the record, and

considering the effects of plaintiff's drug and alcohol intake, ALJ Healey rejected plaintiff's allegations as "not wholly credible."  AT 15.  While acknowledging that plaintiff's hepatitis and congenital nephrotic syndrome undoubtedly present plaintiff with some difficulty, ALJ Healey concluded that plaintiff is primarily disabled by substance abuse.  *Id.*  If plaintiff were to abstain from such abuse, the ALJ concluded, he would be capable of performing a full range of medium work – specifically, that he could sit, stand, and/or walk for six hours in an eight hour work day; lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; and perform simple and repetitive tasks, subject only to limitations in terms of work requiring climbing, heights, or hazards.  *Id.*

At step four of the analysis ALJ Healey observed that plaintiff has not engaged in any past relevant work of significance, and thus appropriately noted the shifting of the burden to the Commissioner at step five to establish the existence of jobs in sufficient numbers in the national economy which the plaintiff is capable of performing, consistent with his RFC.  AT 15-16.  Resorting to the medical-vocational guidelines as a framework and applying the relevant factors, while excluding consideration of plaintiff's drug and alcohol abuse, ALJ Healey concluded that under

Rule 203.28 of the grid, a finding of "not disabled" was warranted.  AT 16.

The ALJ went on to note that were it not for plaintiff's substance abuse,

there would be jobs that exist in significant numbers in the national

economy which plaintiff could perform.  *Id.*  ALJ Healey concluded that

plaintiff's disability resulted from his substance abuse, and that he would

not be disabled if not for that abuse; thus, the ALJ deemed plaintiff's

substance abuse to be a "contributing factor material to the determination

of [plaintiff's] disability", rendering him ineligible for disability payments.

*Id.*

The ALJ's ruling became a final determination of the agency when,

on March 23, 2004, the Social Security Administration Appeals Council

denied plaintiff's request for review of that decision.  AT 4-6.

B.    This Action

Plaintiff commenced this action on May 10, 2004.  Dkt. No. 1.  Issue

was thereafter joined by the Commissioner's filing on November 4, 2004

of an answer, accompanied by an administrative transcript of the evidence

and proceedings before the agency.  AT 10, 11.

Plaintiff's failure to file a brief outlining the arguments in support of

his challenge to the agency's determination led to the issuance of an

17

order by Senior District Judge Neal P. McCurn on March 25, 2005

requiring plaintiff to show cause why the action should not be dismissed

for lack of prosecution.  Dkt. No 13.  That order was later countermanded

in view of an order issued by me on February 22, 2005, directing the

defendant to file a brief in light of plaintiff's failure to do so.  Dkt. Nos. 12,

15, 17.  In view of the submission of defendants' brief, and plaintiff's

failure to file a memorandum, the matter is now ripe for determination and

has been referred to me for the issuance of a report and recommendation,

pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York

Local Rule 72.3(d).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

     A.    Scope of Review

     A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal

v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.

Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*,

817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to

whether the Commissioner applied the proper legal standards, her

decision should not be affirmed even though the ultimate conclusion

reached is arguably supported by substantial evidence.  *Martone*, 70 F.

Supp.2d at 148.  If, however, the correct legal standards have been

applied and the ALJ's findings are supported by substantial evidence,

those findings are conclusive, and the decision should withstand judicial

scrutiny regardless of whether the reviewing court might have reached a

contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586;

*Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13

F. Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. §

405(g).

The term "substantial evidence" has been defined as "'such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420,

1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197,

229, 59 S. Ct. 206, 217 (1938)).  To be substantial, there must be "'more

than a mere scintilla'" of evidence scattered throughout the administrative

record.  *Id.*; *Martone*, 70 F. Supp.2d at 148 (citing *Richardson*).  "To

determine on appeal whether an ALJ's findings are supported by

substantial evidence, a reviewing court considers the whole record,

examining the evidence from both sides, because an analysis of the

substantiality of the evidence must also include that which detracts from

its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v.

NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards

have been applied, and/or that substantial evidence does not support the

agency's determination, the agency's decision should be reversed.  42

U.S.C. § 405(g); *see Martone*, 70 F. Supp.2d at 148.  In such a case the

court may remand the matter to the Commissioner under sentence four of

42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to

develop a full and fair record or to explain his or her reasoning.  *Martone*,

70 F. Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.

1980)).  A remand pursuant to sentence six of section 405(g) is warranted

if new, non-cumulative evidence proffered to the district court should be

considered at the agency level.  *See Lisa v. Secretary of Dep't of Health &

Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without

remand, while unusual, is appropriate when there is "persuasive proof of

disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Retirement Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

B.    Disability Determination: The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.] "  42 U.S.C. § 423(d)(1)(A).   In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be

21

employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled".  *Martone*, 70 F. Supp.2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

    If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it is determined that it does, then as a final matter the agency must examine

whether the claimant can do any other work.  *Id.* §§ 404.1520(f),

416.920(f).

The burden of showing that the claimant cannot perform past work

lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996);

*Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it

becomes incumbent upon the agency to prove that the claimant is capable

of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that

burden has been met, the ALJ should consider the claimant's RFC, age,

education, past work experience, and transferability of skills.  *Ferraris*, 728

F.2d at 585; *Martone*, 70 F. Supp.2d at 150.

C.    The Evidence In This Case

1.    Plaintiff's RFC

The lynchpin of the ALJ's finding of no disability is his conclusion

that notwithstanding his physical and mental conditions, plaintiff retains

the ability to perform medium work.[10]  In order to uphold the

---

[10]    The governing regulations define medium work as follows:

> Medium work involves lifting no more than 50 pounds at a
> time with frequent lifting or carrying of objects weighing up
> to 25 pounds.  If someone can do medium work, we
> determine that he or she can do sedentary and light work.

20 C.F.R. § 404.1567(c).

Commissioner's determination, the court must therefore find that the ALJ's RFC finding is supported by substantial evidence.

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue. 20 C.F.R. § 404.1545(a). An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis. *Id.*; *Martone*, 70 F.Supp.2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. § 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered. 20 C.F.R. § 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F.Supp.2d at 150 (citing *Ferraris*, 728 F.2d at 587). An administrative RFC finding can withstand judicial scrutiny only if there is

substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F.Supp.2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F.Supp. 300, 309-10 (E.D.N.Y. 1997).

Undeniably, plaintiff's alcohol abuse condition is a major contributory factor in connection with the limitations which he now claims to experience.  Because of the plaintiff's admitted history of alcohol abuse, the Commissioner's determination must be reviewed in the context of the Contract with America Advancement Act of 1996 ("CAAA"), Pub. L. 104-121, 110 Stat. 847, legislation which significantly altered the landscape in cases where alcoholism is implicated.  Under the CAAA, which is codified in part at 42 U.S.C. § 423(d)(2)(C), an individual is not considered disabled for purposes of disability insurance and SSI benefits "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C); *see also* 20 C.F.R. § 404.1535; *Rehder v. Apfel*, 205 F.3d 1056, 1059-60 (8th Cir. 2000).

In determining whether alcoholism is a contributing factor material to the determination of disability, the Commissioner, and consequently a

reviewing court as well, must look to whether the claimant is disabled, and if so, whether he or she would still be disabled absent the use of drugs or alcohol.  20 C.F.R. § 404.1535(b); *see also Tablas v. Apfel*, No. 98 Civ. 5430, 2000 WL 423914, at *3 (S.D.N.Y. Mar. 21, 2000); *Orbacker v. Apfel*, 70 F. Supp.2d 291, 294-95 (W.D.N.Y. 1999).  Put another way, an ALJ analyzing a situation involving the use of drugs or alcohol must determine first whether claimant's physical and mental limitations would remain even after use of drugs and alcohol had ended and, if so, whether those remaining limitations would in and of themselves be disabling; if not, then the claimant's alcoholism or drug addiction is properly regarded as a contributing factor material to the determination, and consequently benefits must be denied under the CAAA.  *Rehder*, 205 F.3d at 1060.

In his opinion, the ALJ concluded that while plaintiff is disabled, it is primarily as a result of his alcohol abuse, and that if he did not consume alcohol, he would not be disabled.[11]  The court must therefore review the other medical evidence in the record to determine whether, independent of his alcohol abuse, plaintiff's other physical and mental conditions would

---

[11]   Although in reaching that conclusion the ALJ noted both in his analysis and his findings that application of the grid suggested a finding of "not disabled," it is clear from the context of his decision that this conclusion resulted from applying the grid with the assumption that plaintiff abstained from substance abuse.

nonetheless adversely affect his ability to perform a full range of medium work.

The ALJ's RFC findings, to the extent that they bear upon plaintiff's mental condition, are well supported by the opinions of consulting psychologist Dr. Jeanne Shapiro.[12]  Based upon her examination, Dr. Shapiro opined that while plaintiff's intellectual functioning may be borderline deficient, he is able to follow, understand, and remember simple instructions.  AT 183-84.  In addition, Dr. Shapiro found the plaintiff's thought processes to be coherent and goal directed, with no evidence of delusion, hallucination or disordered thinking.  AT 183.  Dr. Shapiro also found plaintiff's attention and concentration to be intact and that he retains the ability to perform simple calculations.  *Id.*  Dr. Shapiro found plaintiff capable of performing simple tasks with supervision and independently, and that he retains the ability to learn new tasks and to relate to and interact with others appropriately.  AT 184.  According to Dr. Shapiro, plaintiff is also able appropriately to deal with "at least a moderate amount of stress."  *Id.*

---

[12]   In his opinion ALJ Healey mistakenly refers to Dr. Shapiro as a psychiatrist.  AT 14.  There is no indication in the record, however, that the distinction between psychiatrist and psychologist would materially affect the ALJ's determination in the case.

By the same token Dr. Ganesh, who conducted a physical examination of the plaintiff, supports the ALJ's RFC finding.  Based upon his evaluation, and notwithstanding plaintiff's history of physical conditions, Dr. Ganesh concluded that plaintiff experiences no limitations in his ability to sit, stand, walk, climb, bend or squat.  AT 189.  Findings of this nature made by such consultants can provide substantial evidence to support an ALJ's RFC findings.  *Barringer v. Comm'r of Soc. Sec.*, 358 F.Supp.2d 67, 79 (N.D.N.Y. 2005) (Sharpe, J.).

The findings of these consultants are confirmed by opinions of state agency physicians who, based upon review of plaintiff's medical records, have rendered similar opinions.  In a report dated January 28, 2002, state agency consultant Dr. Zenaida Mata discerned only moderate limitations in plaintiff's ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, and to perform activities within a schedule, with no significant limitations in other areas associated with plaintiff's understanding and memory.  AT 191.  Only moderate limitations were found by Dr. Mata in connection with certain areas involving social interaction and adaptation, with no limitations observed in other areas within those categories.  AT 192.  In an

28

accompanying psychiatric review technique form, also dated January 28, 2002, Dr. Mata found only mild limitations in plaintiff's ability to maintain social functioning, with none in the areas of activities of daily living; difficulties in maintaining concentration, persistence or pace; and repeated episodes of decompensation.  AT 204.

Plaintiff's physical capabilities were also analyzed by Dr. Mohammad Husain and analyst Susan Smith, both with the New York State Department of Social Services Office of Disability Determination, based upon their review of plaintiff's records.  AT 208, 220-26.   Dr. Husain concluded that plaintiff is capable of standing, walking, and sitting for six hours in an eight hour work day, and carrying fifty pounds occasionally and twenty-five pounds frequently.  AT 208.  Ms. Smith made similar findings, and discerned no other exertional or nonexertional limitations.  AT 220-26.  Such reports are also properly considered as potentially contributing to substantial evidence supporting an RFC finding, particularly in a case such as this where findings of medical care providers rendering treatment to the plaintiff over such an extended period are sparse.

Based upon the foregoing I conclude that the ALJ's findings

regarding plaintiff's RFC, when the effects of his alcohol intake are

discounted, are supported by substantial evidence.

### 2.   Treating Physicians

One of the few treating sources who has seen plaintiff over any

continuum is Dr. Lewis Castro.  One could argue that Dr. Castro's

opinions are contrary to the findings of the ALJ, based upon Dr. Castro's

opinion that in light of his hypochondroplasia, plaintiff is permanently

unable to perform any work activity.  AT 248.

Ordinarily, the opinion of a treating physician is entitled to

considerable deference, provided that it is supported by medically

acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence.[13]  *Veino*, 312 F.3d at 588;

---

[13]   The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions
> from your treating sources . . . If we find that a
> treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is
> well-supported by medically acceptable
> clinical and laboratory diagnostic techniques
> and is not inconsistent with the other
> substantial evidence in your case record, we
> will give it controlling weight.   When we do
> not give the treating source's opinion
> controlling weight, we apply [various factors]
> in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

*Barnett*, 13 F. Supp.2d at 316.  Such opinions are not controlling,

however, if contrary to other substantial evidence in the record.  *Veino*,

312 F.3d at 588.  Where conflicts arise in the form of contradictory

medical evidence, their resolution is properly entrusted to the

Commissioner.  *Id.*

In deciding what weight, if any, an ALJ should accord to medical

opinions, he or she may consider a variety of factors including "[t]he

duration of a patient-physician relationship, the reasoning accompanying

the opinion, the opinion's consistency with other evidence, and the

physician's specialization or lack thereof[.]"  See *Schisler v. Sullivan*, 3

F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527,

416.927).

When a treating physician's opinions are repudiated, the ALJ must

provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  Failure to apply the appropriate legal standards for

considering a treating physician's opinions is a proper basis for reversal

and remand, as is the failure to provide reasons for rejection of his or her

opinions.  *Johnson*, 817 F.2d at 985; *Barnett*, 13 F. Supp.2d at 316-17.

The opinions of Dr. Castro regarding plaintiff's employability touches

upon an issue expressly reserved to the Commissioner, and thus is not binding upon the ALJ.[14]  20 C.F.R. § 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  Moreover, Dr. Castro's opinion regarding employability is in marked conflict with his office visit notes, as well as his RFC determinations.  Specifically, in his RFC assessment Dr. Castro found that plaintiff is capable of lifting and carrying up to fifty pounds occasionally and twenty pounds frequently, and of sitting for eight hours, standing for four hours, and walking for two hours, in an eight hour work day.  AT 254-55.

In sum, while there is some moderately conflicting evidence, the ALJ's determination that plaintiff retains the RFC to perform medium work is supported by substantial evidence in the record, and did not result from improper rejection of contrary opinions of his treating physician.

### 3.   Plaintiff's Credibility

When asked by the ALJ during the hearing whether he was capable of working, plaintiff responded that he was not.  AT 267-68.  While the ALJ attempted to press the plaintiff regarding the basis for his opinion in that

---

[14]   I note, as did the ALJ, that Dr. Castro's opinion was rendered in the context of employability under Department of Social Services standards, which are not fully congruent with those governing a disability evaluation under the Social Security Act. *See* 20 C.F.R. §§ 404.1504, 416.904.

regard, Curtis could state only that he did not believe, based upon his health, that he would last very long in any given job. *Id.* Throughout the course of the hearing plaintiff testified to various limitations, including memory difficulties and nervousness, as well as the fact that his rectal bleeding is aggravated by walking distances and by lifting, although he did not attribute his belief that he is unable to work to any particular condition. AT 268, 271, 274.

An ALJ must take into account subjective complaints of pain in making the five step disability analysis. 20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d). When examining the issue of pain, however, the ALJ is not required to blindly accept the subjective testimony of a claimant. *Marcus*, 615 F.2d at 27; *Martone*, 70 F. Supp.2d at 151 (citing *Marcus*). Rather, an ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning pain. *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984). In deciding how to exercise that discretion the ALJ must consider a variety of factors which ordinarily would be relevant on the issue of credibility in any context, including the claimant's credibility, his or her motivation, and the medical evidence in the record. *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL

59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. and Smith, M.J.) (citing *Marcus*, 615 F.2d at 27-28)).  In doing so, the ALJ must reach an independent judgment concerning the actual extent of pain suffered and its impact upon the claimant's ability to work.  *Id.*

When such testimony is consistent with and supported by objective clinical evidence demonstrating that claimant has a medical impairment which one could reasonably anticipate would produce such pain, it is entitled to considerable weight.[15]  *Barnett*, 13 F. Supp.2d at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If the claimant's testimony concerning the intensity, persistence or functional limitations associated with his or her pain is not fully supported by clinical evidence, however, then the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

---

[15]   In the Act, Congress has specified that a claimant will not be viewed as disabled unless he or she supplies medical or other evidence establishing the existence of a medical impairment which would reasonably be expected to produce the pain or other symptoms alleged.  42 U.S.C. § 423(d)(5)(A).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp.2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such testimony is rejected, however, the ALJ must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  *Martone*, 70 F. Supp.2d at 151 (citing *Brandon v. Bowen,* 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review.  *Aponte v. Secretary, Dep't of Health & Human Servs. of U.S.,* 728 F.2d 588, 591 (2d Cir. 1984).

It may be, as plaintiff asserts, that he does suffer from some degree of discomfort as a result of his nephrotic syndrome.  The fact that he suffers from discomfort, however, does not automatically qualify him as disabled, since "disability requires more than mere inability to work without pain."  *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).

It could be said that the ALJ's reasoning for rejecting plaintiff's

testimony regarding his limitations is not very well explained as contemplated by the regulations.  *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  In order to reach his finding of no disability, however, the ALJ was not required to make significant credibility determinations since plaintiff's testimony, even generously construed, is not necessarily inconsistent with the finding that he is able to perform medium work. Accordingly, I recommend a finding that substantial evidence supports the ALJ's determination notwithstanding the potential issue of credibility.

### 4.   Step Five Determination

After concluding that plaintiff had no prior relevant work experience for consideration at step four, the ALJ proceeded at step five to consider his RFC finding utilizing the grid as a framework.

Ordinarily, the Commissioner can meet her burden in connection with the fifth step of the relevant disability test by utilizing the grid.  *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  The grid takes into consideration a claimant's RFC, as well as his or her age, education and work experience, in order to determine whether he or she can engage in substantial gainful work in the national economy.  *Id.*  Whether or not the grid should be applied in order

to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved.  *Bapp*, 802 F.2d at 605. If a plaintiff's situation fits well within a particular classification, then resort to the grid is appropriate.  *Id.*  If, on the other hand, nonexertional impairments, including pain, <u>significantly</u> limit the range of work permitted by exertional limitations, then use of the grid is inappropriate, in which case further evidence and/or testimony is required.[16]  *Rosa*, 168 F.3d at 78; *Bapp*, 802 F.2d at 605-06.

Having reviewed the record I find that the Commissioner's resort to the grid was appropriate and that aside from his alcohol abuse, plaintiff does not appear to suffer from any nonexertional limitations which would preclude him from performing a full range of medium work and render resort to the grid inappropriate.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

While it is abundantly clear that the plaintiff is, or was at certain of

---

[16]   As one court has explained,

> [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain.

*Sobolewski*, 985 F. Supp. at 310 (citing 20 C.F.R. § 404.1569(a), (c)).

the times relevant to his benefits application, disabled within the meaning

of the Social Security Act, it is also clear that the reason for that disability

was his alcohol abuse condition – one which he has been unable or

unwilling to successfully combat.  Although plaintiff plainly does suffer

from other limitations, chiefly those associated with his hypochondroplasia

and nephrotic syndrome, there is no proof in the record to undermine the

ALJ's finding that notwithstanding that condition plaintiff is able to perform

a full range of medium work and thus, in accordance with the grid, is not

disabled.

  Based upon the foregoing it is hereby

  RECOMMENDED that defendant's motion for judgment on the

pleadings be GRANTED, the Commissioner's determination of no

disability AFFIRMED, and plaintiff's complaint in this matter DISMISSED

in all respects.

 NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written

objections to the foregoing report.  Such objections shall be filed with the

Clerk of the Court within ten (10) days.  FAILURE TO SO OBJECT TO

THIS REPORT WILL PRECLUDE APPELLATE REVIEW.   28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roland v. Racette*, 984 F.2d 85

(2d Cir. 1993).

IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy of this Report and Recommendation upon the plaintiff by regular mail, and upon the defendant electronically.

Dated:     July 12, 2006
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

G:\socialsecurity\curtisoriginal.wpd